1

**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
11250 EL CAMINO REAL, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: 858.847.6700
FACSIMILE: 858.792.6773

2

3

Debra D. Nye, Cal. Bar No. 226076
dnye@foley.com

4

Attorneys For Respondent,
VIC NARURKAR, M.D.

5

6

## UNITED STATES DISTRICT COURT

7

## NORTHERN DISTRICT OF CALIFORNIA

8

## SAN FRANCISCO DIVISION

9

CANDELA CORPORATION, et al.,

10

                Plaintiffs,

11

        v.

12

PALOMAR MEDICAL TECHNOLOGIES, INC.,

13

                Defendant.

14

15

16

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

) Case No. C08-80011 Misc PJH (EDL)
)
) **VIC NARURKAR, M.D.'s OPPOSITION**
) **TO PLAINTIFFS' MOTION TO COMPEL**
) **DR. VIC NARUKAR TO PRODUCE**
) **SUBPOENAED DOCUMENTS**
)
) Hearing:    March 11, 2008
) Time:       9:00 a.m.
) Place:      Courtroom E
)
) The Honorable Elizabeth Laporte
)

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

BACKGROUND .......................................................................................................... 1

ARGUMENT ............................................................................................................... 4

    I.     The Harmful Disclosure of Confidential Patient
          Records Is Unjustified ........................................................... 4

    II.    The Motion Should Be Denied Because the
          Subpoena Exceeds the Permissible Scope of
          Discovery ................................................................................. 6

    III.   The Motion Should Be Denied Because, Even if
          Any of the Patient Information It Seeks Could
          Be Relevant, the Subpoena Is Overbroad ........................... 8

    IV.   The Motion Should be Denied Because the
          Subpoena Is Oppressive and Unduly Burdensome ........................................... 11

          A.    Dr. Narurkar Is Not a Party to this Action ................................................. 10

          B.    The Subpoena Would Force Dr. Narurkar
               to Divert Limited Resources Away from
               His Patients And Practice Thereby
               Disrupting His Practice and Causing
               Irreparable Harm ........................................................................................ 11

          C.    Specific Requests ...................................................................................... 12

    CONCLUSION ........................................................................................................... 13

1

## TABLE OF AUTHORITIES

2

**Cases**                                                                                     **Page(s)**

3

Bridgeport Music, Inc. v. UMG Recordings, Inc.,
  No. 05 Civ. 6430, 2007 WL 4410405 (S.D.N.Y. Dec. 17, 2007)............................ 11

4

Cusumano v. Microsoft Corp.,
  162 F.3d 708 (1st Cir. 1998)..................................................................... 10, 11

5

6

Dart Indus. Co. v. Westwood Chem. Co.,
  649 F.2d 646, 649 (9th Cir. 1980) ………………………………………….....10

7

EEOC v. Boston Mkt. Corp.,
  No. 03 Civ. 4227, 2004 U.S. Dist. LEXIS 27338 (E.D.N.Y. Dec. 16, 2004).............. 5

8

9

Exxon Shipping Co. v. United States Dep't of Interior,
  34 F.3d 774, 779 (9th Cir. 1994) ........................................................................ 11

10

Gonzales v. Google, Inc.,
  234 F.R.D. 674, 680 (N.D. Cal. 2006) ................................................................ 10

11

12

Hewlett-Packard Co. v. Bausch & Lomb, Inc.,
  909 F.2d 1464 (Fed. Cir. 1990).......................................................................... 7

13

Kalinoski v. Evans,
  377 F. Supp. 2d 136 (D.D.C. 2005) ...................................................................... 5

14

15

Mack v. Great Atlantic & Pacific Tea Co.,
  871 F.2d 179 (1st Cir. 1989)............................................................................... 9

16

Micro Motion, Inc. v. Kane Steel Co.,
  894 F.2d 1318 (Fed. Cir. 1990)................................................................... 5, 8, 10

17

18

Rivera v. NIBCO, Inc.,
  364 F.3d 1057, 1072 (9th Cir. 2004) ................................................................... 9

19

Trustees of Columbia Univ. v. Roche Diagnostics GMBH,
  272 F. Supp. 2d 90 (D. Mass. 2002) ..................................................................... 7

20

21

Warner-Lambert Co. v. Apotex Corp.,
  316 F.3d 1348 (Fed. Cir. 2003)........................................................................... 9

22

**Statutes, Rules and Regulations**

23

35 U.S.C. § 271(b) ................................................................................................ 7

24

Fed. R. Civ. P. 26(b)(1)........................................................................................ 4

25

Fed. R. Civ. P. 26(b)(2)(C) .................................................................................. 4

26

Fed. R. Civ. P. 45(c) ........................................................................................... 2

27

Fed. R. Civ. P. 45(c)(1)........................................................................................ 10

28

1

Health Insurance Portability and Accountability Act of 1996 ("HIPAA")
42 U.S.C.S. §§ 1320d-1329d-8 ..................................................................................... 5

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DR. VIC NARURKAR'S**
**OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**
**PRODUCTION OF SUBPOENAED DOCUMENTS**

Dr. Vic Narurkar hereby opposes Plaintiffs' Motion to Compel him To Produce Subpoenaed Documents (the "Motion"). The Motion seeks to compel Dr. Narurkar, a third-party with no stake in the underlying patent infringement litigation, to produce confidential and sensitive patient treatment files – a task that will require him to review thousands of files. Plaintiffs' demand for these confidential medical records of Dr. Narurkar's patients – who also do not have any involvement in this litigation and who have not consented to the disclosure of their records – will be extremely harmful both to Dr. Narurkar's practice and to his patients.

Moreover, Plaintiffs have failed to establish that *any* of these files are relevant to the claims or defenses of the actual parties in the underlying lawsuit. The Motion – one of at least eight such "cookie-cutter" motions Plaintiffs have directed against various doctors across the country – represents an improper attempt by Plaintiffs to have this Court aid Plaintiffs' fishing expedition by enforcing an overly broad subpoena *duces tecum*.

For these reasons and the reasons stated below, the Motion should be denied, at least until Plaintiffs can establish the relevance of the materials they seek and, if so, narrow their requests and develop less burdensome and more protective means for any collection and production.

**BACKGROUND**

The underlying patent infringement action concerns light-based dermatology products. Plaintiffs accuse Defendant Palomar Medical Technologies, Inc. ("Palomar") of infringing their patents through Palomar's manufacture, use, and sale of various products (the "Accused Products") to doctors.[1] Plaintiffs believe these Accused Products can be used to treat wrinkles in human skin, the subject matter of the patents-in-suit. Plaintiffs contend that Palomar is inducing doctors to treat patients for wrinkles with Palomar products. Plaintiffs have not, and do not now,

---

[1]    The Accused Products are used for aesthetic laser treatments. The products consist of handheld attachments used with Palomar's laser and pulsed light base platforms. The handpieces are named the Lux 1540, the Lux 1540-Z, the LuxIR, the LuxDeepIR, the LuxB, the LuxG, and the LuxY.

DR. VIC NARURKAR'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
CASE NO. CV-04-03843 RMW (HRL)

accuse Dr. Narurkar of anything.  Attempting to find some possible evidence to support their inducement theories against Palomar, in early November 2007, Plaintiffs served a subpoena on Dr. Narurkar, along with identical subpoenas served on approximately 22 other physicians across the country (the "First Subpoena").  In the First Subpoena, Plaintiffs requested documents spanning 34 separate categories.

Dr. Narurkar retained the law firm of Foley & Lardner LLP (which also represents Palomar in the underlying litigation) and objected to the First Subpoena by serving objections pursuant to Fed. R. Civ. P. 45(c).[2]  In response, Plaintiffs withdrew the First Subpoena (along with the subpoenas it had served on all of the other physicians represented by Foley & Lardner LLP).  On or about December 4, 2007, Plaintiffs served the current subpoena (the "Subpoena").

The Subpoena seeks communications between Dr. Narurkar and Palomar, as well as marketing and product information that Palomar provided to Dr. Narurkar, apparently directed to identifying any inducement by Palomar to use the Accused Products to treat wrinkles.  (See, e.g., Subpoena, request nos. 3, 6, & 10.)  However, the Subpoena goes further, and also seeks Dr. Narurkar's patient treatment records themselves.  (See, e.g., Subpoena, request nos. 4, 5, & 9.)  In fact, the Subpoena extends to thousands of such patient files by calling for all treatments that involved any "Wrinkle Treatment."  (See id.)  The term "Wrinkle Treatment" is broadly defined in the Subpoena as the "application of Electromagnetic Radiation to skin for treatments that provide as a primary or peripheral benefit treating wrinkles, fine lines or rhytides/rhytids . . . correction of skin laxity, or performing skin smoothing, skin tightening, skin or facial rejuvenation, photorejuvenation, photofacials, skin resurfacing, tissue coagulation or improvement of skin texture or tone."  (Id. at 5.)  This broad list of treatments encompasses

---

[2]    Plaintiffs contrast Dr. Narurkar to another physician "who chose to not be represented by Palomar's counsel" and who "voluntarily produced a highly relevant set of documents . . . obviating Plaintiffs' filing of a motion to compel for that physician's documents."  (Memo. p. 5.)  That referenced physician is one Tiffani K. Hamilton, M.D., who works on behalf of Plaintiff Candela in marketing Candela's products.  (See Plaintiff Candela's "Clinical Bulletin No. 6" featuring Dr. Hamilton, a copy of which is attached hereto as Exhibit A.)  Unlike Dr. Narurkar, Dr. Hamilton is not an independent third-party.

virtually every possible light based dermatological treatment including scars, vascular lesions, pigment lesions, and acne, as well as any treatments of actual skin wrinkles.

On December 14, 2007, Dr. Narurkar objected to the Subpoena pursuant to Fed. R. Civ. P. 45(c). Dr. Narurkar explained, *inter alia*, that the burden of responding to the Subpoena would be onerous and the production of confidential records would be detrimental to him and his patients for several reasons. First, the patient records contain their medical histories and other sensitive personal information. In many instances, the patient records contain photographs of patients showing cosmetic and medical treatments. (Dr. Narurkar Decl., ¶ 7.)

Second, Dr. Narurkar's patient records are maintained alphabetically. (Dr. Narurkar Decl., ¶ 4.) They are not arranged by the date when each patient was seen or the type of procedure or treatment performed on the patient. (Dr. Narurkar Decl., ¶ 4.) Dr. Narurkar's patient records number in the thousands. (Dr. Narurkar Decl., ¶ 2.) Dr. Narurkar estimates that it would take several months to review the medical records in his possession to just determine what treatments were used on individual patients. (Dr. Narurkar Decl., ¶ 3.) There is only one administrative employee working with Dr. Narurkar; the services of this employee are essential to the operation of Dr. Narurkar's office. (Dr. Narurkar Decl., ¶ 5.) If this individual was required to take time away from her normal duties to assist Dr. Narurkar in reviewing the records, Dr. Narurkar's practice would suffer significant harm as a result of the allocation of resources away from patients and the operation of Dr. Narurkar's practice. (Dr. Narurkar Decl., ¶ 6.)

Third, the disclosure of confidential patient records – which include photographs in many instances – could be ruinous to Dr. Narurkar's practice, because his patients' privacy would be irreparably violated. (Dr. Narurkar Decl., ¶ 7.) The invasion of patient privacy would undermine the confidence reposed by Dr. Narurkar's patients in his practice, and would likely prompt many of his patients to discontinue their association with Dr. Narurkar. (Dr. Narurkar Decl., ¶ 7.)

In late December and early January, counsel for all parties met and conferred about Dr. Narurkar's objections and his concerns on his own behalf and that of his patients. Dr. Narurkar

agreed to produce any communications he had with Palomar and any marketing or similar product information from Palomar. (Tolliver Decl., Exhibit 5.)

Despite this offer, Plaintiffs continue to insist that Dr. Narurkar also review, collect, and produce all of his requested patient records and treatment files. Thus, without establishing that Palomar ever induced Dr. Narurkar to do anything, Plaintiffs are seeking to steamroll over substantial patient confidentiality issues without concern for the consequences to those patients or to Dr. Narurkar's reputation and medical practice.

## ARGUMENT

The Motion seeks to enforce a Subpoena that seeks the harmful disclosure of confidential patient information and medical treatment records. The Subpoena also is not narrowly tailored to seek the discovery of only relevant or potentially relevant documents, and is overly broad, unduly burdensome and oppressive to both Dr. Narurkar and his patients, and, therefore, should be denied. See Fed. R. Civ. P. 26(b)(1) & 26(b)(2)(C).

## I.     THE HARMFUL DISCLOSURE OF CONFIDENTIAL PATIENT RECORDS IS UNJUSTIFIED.

Dr. Narurkar's patients would balk upon learning that their private patient files containing highly sensitive personal information had been disclosed without their consent to parties in a litigation that has no connection to them or to their doctor. Although the interests of these patients would be irreversibly affected by such production, none of the patients are represented in this matter or in the underlying action. Notably, none of the authorities cited by Plaintiffs involve such a wholesale invasion of patient privacy that Plaintiffs are demanding through their request for the production of thousands of confidential patient records from a non-party physician's private practice.[3]

---

[3]     Plaintiffs' reference to Boston Mkt. Corp. (Memo. p. 17) is inapposite because – unlike the respondent to the Subpoena in this case – the respondents in Boston Mkt. Corp. were doctors who treated the *plaintiff* and the plaintiff had specifically placed her medical condition at issue in that lawsuit. EEOC v. Boston Mkt. Corp., 2004 U.S. Dist. LEXIS 27338, at *2 (E.D.N.Y. Dec. 16, 2004). Even there, the court circumscribed the type of information that could be provided to the requesting party. Id. at *20-21.

DR. VIC NARURKAR'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
CASE NO. CV-04-03843 RMW (HRL)

There is a "strong federal policy in favor of protecting the privacy of patient medical records." <u>EEOC v. Boston Mkt. Corp.</u>, 2004 U.S. Dist. LEXIS 27338, *18 (E.D.N.Y. Dec 16, 2004); 42 U.S.C.S. §§ 1320d-1329d-8, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  Plaintiffs propose only passing consideration to this "strong federal policy" favoring patient confidentiality by offering to have the patient records produced under the protective order entered in the underlying action.  The underlying protective order, however, lacks any reference to medical records or patient information (<u>see</u> Tolliver Decl., Exhibit 2) and the Plaintiffs have made no effort to have it altered to accommodate these circumstances.[4]  Neither Dr. Narurkar nor any of the unrepresented patients had an opportunity to negotiate the terms of the protective order.  In addition, individual patients whose records were disclosed to Plaintiffs would lack the resources and/or standing to enforce the terms of such an order in the event their records were disclosed to others.  <u>See</u> <u>Micro Motion, Inc. v. Kane Steel Co., Inc.</u>, 894 F.2d 1318, 1325 (Fed. Cir. 1990) (rejecting patent holder's "argument that the protective order . . . obviates [respondent's] objections to discovery.  The protective order is not a substitute for establishing relevance or need."  And noting that "[i]t would be divorced from reality to believe that either party" to the underlying litigation "would serve as the champion" of the respondent, and "disclosure of its information depends on the action by a court before whom it has no standing.").  Thus, the existence of a protective order provides no justification for the wholesale violation of patient trust in the confidentiality of their own records.[5]

In the event that confidential patient information were improperly disclosed (whether intentionally or unintentionally), the resulting harm would be irreversible and irreparable.  For

---

[4]     Moreover, the terms of the protective order permit a party to the lawsuit to challenge the designation of a record as confidential (Tolliver Decl., Exhibit 2), thereby inviting a circumstance where the confidentiality of patient records would be removed after the records are produced – a circumstance that neither Dr. Narurkar nor his patients could realistically prevent.

[5]     Plaintiffs' reliance on <u>Kalinoski v. Evans</u>, 377 F. Supp. 2d 136 (D.D.C. 2005) (Memo. p. 20) for their contention that the existing protective order is appropriate is misplaced, because the physician/patient privilege was *waived* there when the plaintiff *consented* to the disclosure of her records and placed her mental health at issue in the lawsuit.  There has been nothing close to such a waiver here.

DR. VIC NARURKAR'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
CASE NO. CV-04-03843 RMW (HRL)

example, there would not be adequate remedies available to a patient whose treatment photographs were utilized in open court or otherwise released into the public domain.  And while the risk of this occurrence may be small, it only exists if any medical records are produced pursuant to the Motion.  Thus, in light of the unknown risk of further dissemination of confidential patient records and the high degree of harm to the unsuspecting patients (as well as to Dr. Narurkar) that would result from such disclosure, Plaintiffs have failed to justify the production of Dr. Narurkar's patient records.

The disclosure of confidential patient records also risks ruining Dr. Narurkar's practice and his professional reputation, because such an invasion of patient privacy would likely deter present and future patients from seeking treatment from Dr. Narurkar.  Plaintiffs dismiss Dr. Narurkar's concerns by arguing that "[e]very health care provider is subject to the same privacy rules as Dr. Narurkar.  Patients cannot therefore escape the possibility that their medical records might be subpoenaed by going to another health care provider.  Dr. Narurkar's reputation is therefore no more at risk that those of his competitors."  (Memorandum of Points and Authorities in Support of the Motion ("Memo."), pp. 20-21.)  Plaintiffs are wrong.  Dr. Narurkar along with the other physicians subpoenaed by Plaintiffs are facing a great and immediate risk for irreparable harm compared to their fellow physicians, because most of their fellow physicians were *not* subpoenaed by Plaintiffs and most of them do not use Palomar's products.  Thus, Dr. Narurkar is facing *unique* harm among his competitors.  In sum, the burden of producing confidential patient records outweighs the benefit to any party that would flow from their disclosure.

## II.    THE MOTION SHOULD BE DENIED BECAUSE THE SUBPOENA EXCEEDS THE PERMISSIBLE SCOPE OF DISCOVERY.

The underlying litigation involves three patents directed to *the treatment of wrinkles* in human skin.  (Memo. pp. 2-4.)  The vast majority of the asserted patent claims are method claims – claiming the method of actually treating patients to remove their wrinkles.  Palomar is the sole defendant accused of infringement.  Palomar, however, does not treat patients.  Like its competitor, Plaintiff Candela Corporation, Palomar only manufactures and sells light-based skin

treatment products.  Therefore, to prove Palomar has infringed the method claims, Plaintiffs must attempt to find doctors who are treating patients for wrinkles with Palomar's Accused Products and then must show that Palomar somehow actively induced those doctors to do so.  See 35 U.S.C. § 271(b); Trustees of Columbia Univ.  v. Roche Diagnostics GMBH, 272 F. Supp. 2d 90, 104 (D. Mass. 2002) (holding "this statute is analogous to a criminal statute imposing liability for one who acts as an accessory before the fact.").[6]

As a result, even if there are doctors using Palomar's Accused Products to treat wrinkles, any evidence of such treatments is *only relevant* to Palomar and this lawsuit *if* Plaintiffs can show Palomar intentionally induced those doctors to perform those treatments.  See Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1469 (Fed. Cir. 1990) (holding "proof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement.").  Plaintiffs' subpoenas demand potential evidence of any such inducement by including several categories directed to any communications between Dr. Narurkar and Palomar, as well as marketing materials, presentations, and other materials provided by Palomar to Dr. Narurkar.  (See, e.g., Subpoena, request nos. 3, 6, & 10.)

Plaintiffs' subpoenas, however, do not stop with potential evidence of inducement by Palomar.  Instead, they assume such evidence exists and simultaneously demand Dr. Narurkar's highly sensitive patient treatment records, including all documents that show the number of times Dr. Narurkar used one of the Accused Products, documents concerning the evaluation of treatment with an Accused Product, and photographs of patients.  (See, e.g., Subpoena, request nos. 4, 5, & 9.)  This puts the cart before the horse.  If Palomar has not induced Dr. Narurkar to use the Accused Products in an infringing manner, then Dr. Narurkar's treatment records and patient files are wholly irrelevant to the underlying action and not the subject of proper discovery.  Without evidence of Palomar inducing Dr. Narurkar, there is no reason to subject Dr.

---

[6]    Plaintiffs concede they have not sued the third-party doctors for infringement and further concede they seek the doctor's patient records in connection with attempting to prove inducement claims against Palomar.  (Memo. pp. 4 and 6.)

Narurkar to the risk, burden, and injury of having to search and produce his patient records.

The Federal Circuit has rejected improper attempts to obtain irrelevant material from third-parties.  See, e.g., Micro Motion, Inc., 894 F.2d 1318.  In Micro Motion, a patent owner sought to obtain discovery of confidential business information from a non-party in connection with a patent infringement suit.  894 F.2d at 1319.  The non-party respondent sought to quash the patent owner's subpoena on the basis that the information sought (i.e., records concerning use of the relevant products and customer information) was not relevant, the confidentiality of the information was essential, and disclosure would cause the respondent "serious, if not irreparable, injury."  Id. at 1321.  The Federal Circuit affirmed the judgment of the district court denying the patent owner's requested discovery because the patent owner was engaging in "merely speculative inquiries in the guise of relevant discovery."  Id. at 1328.  Specifically, the court noted that: "The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable *without discovery*, not to find out if it has any basis for a claim."  Id. at 1327 (emphasis original) (internal citations omitted).  The Federal Circuit further found, as is the case with Dr. Narurkar's patient files here, that the potential damage that would follow the disclosure of confidential business information was substantial, and that the patent owner had not sufficiently demonstrated that the requested discovery was sufficiently relevant and necessary. Id. at 1325.

Before invading the privacy of Dr. Narurkar's patients, disrupting Dr. Narurkar's practice, and risking the destruction of Dr. Narurkar's reputation and livelihood, Plaintiffs must first establish that the patient records they seek are relevant and discoverable.  If the communications with Palomar and other materials Dr. Narurkar has produced do not establish any inducement, the more sensitive patient records are irrelevant and need not be produced.

## III.    THE MOTION SHOULD BE DENIED BECAUSE, EVEN IF ANY OF THE PATIENT INFORMATION IT SEEKS COULD BE RELEVANT, THE SUBPOENA IS OVERBROAD.

Plaintiffs also face another steep hurdle here.  *None* of the Accused Products are approved by the United States Food and Dug Administration ("FDA") for the treatment of

wrinkles.  Instead, they are approved for treating other skin conditions including hair removal, vascular and pigmented lesions, and scars.  So in order for Plaintiffs to prove infringement by Palomar, they must find doctors who are using the Accused Products "off-label" for treating wrinkles and show that Palomar intentionally induced those doctors to perform those "off-label" treatments.  See Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1365 (Fed. Cir. 2003) (requiring evidence of manufacturer's intentional inducement of doctor's "off-label" uses).

Desperate to find any such evidence of doctors treating wrinkles with Palomar's products, Plaintiffs served, and now move to enforce, overbroad subpoenas in an improper fishing expedition.[7]  The Subpoena employs a definition of "Wrinkle Treatment" that goes well beyond actually treating wrinkles.  (See Tolliver Decl., Exhibit 2, p. 5.)  The Plaintiffs' definition of "Wrinkle Treatment" includes broad terms loosely used in the skin care industry by dermatologists to mean treating a wide array of skin conditions – "skin rejuvenation," "photofacials," etc.  These terms encompass many different types of skin treatment, and expand the Subpoena to cover much more than simply any treatments of wrinkles.  (See id.)

Thus, the issue is not one of "confusion" as Plaintiffs claim (Memo. pp. 15-16) over what their definition of "Wrinkle Treatment" means, it is one of overbreadth and relevance.  The Plaintiffs' offer to remove the reference to "Wrinkle Treatment" altogether (Memo. p. 16) only serves to expand the scope of the Subpoena, as the removal of such reference leaves the request for records unrestricted.

Plaintiffs should not be allowed "to undertake wholly exploratory operations in the vague hope that something helpful will turn up."  Mack v. Great Atlantic & Pacific Tea Co., Inc., 871 F.2d 179, 187 (1st Cir. 1989).  In other words, this court "need not condone the use of discovery to engage in 'fishing expeditions.'"  Rivera v. NIBCO, Inc., 364 F.3d 1057, 1072 (9th Cir. 2004) (citation omitted).

---

[7]    Illustrating how broadly and haphazardly Plaintiffs have cast their nets, Plaintiffs served one of their subpoenas on a physician who does not use or possess a *single one* of the Accused Products. Undeterred, Plaintiffs filed a motion to compel the production of that physician's documents in the Eastern District of Virginia.

Plaintiffs' patents-in-suit are directed only to "treating wrinkles." (Memo. p. 2) Plaintiffs, therefore, are only entitled to evidence about treating wrinkles. Assuming Plaintiffs can first show the Court some evidence of Palomar inducing Dr. Narurkar to treat wrinkles, (see, supra, Section II), Dr. Narurkar should only be required to review and produce treatment records and patient files of such actual wrinkle treatments and not files relating to the treatment of other skin conditions covered by Plaintiffs' overbroad definition. See Micro Motion, Inc., 894 F.2d at 1328 (rejecting patent owner's attempt to engage in "merely speculative inquiries in the guise of relevant discovery").

## IV. THE MOTION SHOULD BE DENIED BECAUSE THE SUBPOENA IS OPPRESSIVE AND UNDULY BURDENSOME.

Rule 45(c)(1) requires that "[a] party or an attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(c)(1). "[A] court determining the propriety of a subpoena balances the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena." Gonzales v. Google, Inc., 234 F.R.D. 674, 680 (N.D. Cal. 2006). In addition to the damage to Dr. Narurkar and his patients that would result from the production of confidential patient records discussed in Section I above, the Plaintiffs' failure to show the relevance of the documents discussed in Section II, and the overly broad definitions and requests discussed in Section III, additional factors in determining whether there is an undue burden on Dr. Narurkar weigh in favor of denying the Motion.

### A. Dr. Narurkar Is Not A Party To This Action.

"Underlying the protections of Rule 45 is the recognition that 'the word non-party serves as a constant reminder of the reasons for the limitations that characterize third-party discovery. subpoena.'" Gonzales, 234 F.R.D. at 680, quoting Dart Indus. Co. v. Westwood Chem. Co., 649 F.2d 646, 649 (9th Cir. 1980); see also Cusumano v. Microsoft Corp., 162 F.3d 708, 717 (1st Cir. 1998) (noting that "concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs"). "The Federal Rules . . . afford nonparties special protection against the time and expense of complying with subpoenas."

1   Exxon Shipping Co. v. United States Dep't of Interior, 34 F.3d 774, 779 (9th Cir. 1994).  It is

2   thus particularly relevant to this Motion that Dr. Narurkar has no stake in the underlying

3   litigation, and was not involved in any transactions that would have led him to anticipate that he

4   would be subpoenaed in this action.  See Exxon Shipping Co., 34 F.3d at 779; Gonzales, 234

5   F.R.D. at 680; see also Cusumano, 162 F.3d at 717 (upholding District Court's denial of motion

6   to compel and stating that "[i]t is also noteworthy that the respondents are strangers to the

7   antitrust litigation; insofar as the record reflects, they have no dog in that fight. Although

8   discovery is by definition invasive, parties to a law suit must accept its travails as a natural

9   concomitant of modern civil litigation. Non-parties have a different set of expectations.").

10          Since Dr. Narurkar is a non-party respondent with no connection to this action, Plaintiffs'

11  reliance on Bridgeport Music, Inc. v. UMG Recordings, Inc., 2007 WL 4410405 (S.D.N.Y. Dec.

12  17, 2007) (Memo. pp. 13-14), is wholly misplaced.  In Bridgeport Music, Inc., the non-party

13  respondent was "the drafter of the agreement at issue," was "indisputably integral to the parties'

14  relationship during the crucial time period," and "as a former attorney for one of the parties, it

15  was foreseeable that he would be asked for records related to services he performed for his

16  former client that is now the subject of litigation."  2007 WL 4410405, * 3 n.4.  In addition, the

17  subpoena there contained "only one document request and that request is relatively narrow," (id.

18  at *2) and "the information in question is not confidential, nor is the request overly burdensome"

19  (id. at *3 n.5).  Plaintiffs do not contend that Dr. Narurkar was involved in any aspect of the

20  underlying dispute here (and there would be no basis for such a contention) and, thus, the burden

21  of responding to the Subpoena is particularly unwarranted here.  Moreover, in contrast to

22  Bridgeport Music, Inc., the document requests here are broad, they are overly burdensome, and

23  they seek confidential information.

24          B.      The Subpoena Would Force Dr. Narurkar To Divert Limited Resources Away
                    From His Patients And Practice Thereby Disrupting His Practice And Causing
25                  Irreparable Harm.

26          Plaintiffs argue that they made significant modifications – withdrawing the First

27  Subpoena and offering to reduce the scope of the current Subpoena – in order to avoid imposing

28

11

undue burden on Dr. Narurkar.  However, the breadth of the documents sought by Plaintiffs through the Motion belies this assertion.  Although Plaintiffs reduced the number of requests contained in the First Subpoena from 34 to the 8 categories of documents it is seeking here, the burden of compliance imposed upon Dr. Narurkar remains high.  The remaining requests require the review of, *inter alia*, thousands of patient files.  (See Dr. Narurkar Decl., ¶ 2.)

The Subpoena's limitation to a particular timeframe or treatment is not determinative of the burden on Dr. Narurkar.  Dr. Narurkar's medical records are maintained alphabetically by patient, and not categorized by the type of laser treatment provided to each patient.  (Dr. Narurkar Decl., ¶ 4.)  Thus, in order to determine which records – among thousands of records – are responsive, Dr. Narurkar would have to review practically all of his patient records to identify any responsive documents.  As discussed above, Dr. Narurkar estimates that it would take several months to review his medical records.  (Dr. Narurkar Decl., ¶ 3.)  The diversion of Dr. Narurkar's limited resources from the operation of his practice would cause an unscheduled interruption to his business, thereby causing irreparable harm, accordingly, the Motion should be denied.  (See Dr. Narurkar Decl., ¶ 7.)

C.    Specific Requests

While the foregoing discussion addresses the entirety of the Subpoena, the following points are relevant to the determination of the propriety of Plaintiffs' request for an order compelling the production of documents described by each of the categories.

To the extent that Dr. Narurkar has responsive documents in his possession, custody, or control (as specifically indicated below), he will produce documents in response to the following categories:[8]

- *Category No. 1*:  Dr. Narurkar has no such documents in his possession, custody, or control.

- *Category Nos. 3 & 10*:  Dr. Narurkar will produce communications concerning

---

[8]    Category No. 7 has been voluntarily withdrawn by Plaintiffs.

DR. VIC NARURKAR'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
CASE NO. CV-04-03843 RMW (HRL)

use of the Accused Products as limited and described by the Plaintiffs in the Motion.

- *Category No. 8*:  While Plaintiffs already have any such documents, as they were previously produced by Palomar, Dr. Narurkar will produce the requested documents in his possession, custody, or control to the extent they concern the Accused Products.

In light of the fact that the remaining request for documents seek irrelevant information, implicate patient privacy concerns, and subject Dr. Narurkar to unduly burdensome production, Dr. Narurkar reiterates his objections to producing documents described in the following categories:

- *Category Nos. 2 & 6*:  Dr. Narurkar's marketing of the Accused Products (including any patient photographs he has used for marketing purposes) is only relevant if there is any evidence of inducement.  As more fully discussed in Section II above, unless there is evidence of inducement shown by any other document in Dr. Narurkar's possession, custody, or control, his marketing materials – i.e., those materials that he uses to market his own services – are irrelevant and will not be produced.  Moreover, as discussed in Section III above, Plaintiffs' definition of "Wrinkle Treatment" is so broad it would cover virtually all of Dr. Narurkar's marketing materials and, therefore, this request exceeds the permissible scope of discovery.  (To the extent that these requests call for communications that are otherwise described in category nos. 3 & 10, such communications will be produced as stated above.)

- *Category Nos. 4, 5, & 9*: For all of the reasons discussed above, Plaintiffs' request for these materials is beyond the scope of discovery and, since Dr. Narurkar will not violate his patients' confidentiality, the requested materials will not be produced without a court order.

### CONCLUSION

WHEREFORE, for the reasons set forth herein, Dr. Narurkar respectfully requests that

13

the Plaintiff's Motion to Compel be DENIED.

DATE:  FEBRUARY 19, 2008                              FOLEY & LARDNER LLP


                                                     _/S/_____

                                                     DEBRA D. NYE



*Tiffani K. Hamilton, M.D.*

# CLINICAL BULLETIN
## NO. 6

## Photo-rejuvenation Using Combination Laser Therapies from Candela

*Tiffani K. Hamilton, M.D.*

*Atlanta Dermatology*

*Vein and Research Center*

*Alpharetta, Georgia*

## Introduction

For patients concerned with looking younger, looking healthier, and looking better, there is a plethora of lasers today offering a wide variety of noninvasive means to improve the appearance of one's skin. Modern lasers can provide everything from wrinkle reduction and scar revision to vascular and pigmented lesion removal, all with minimal downtime and patient discomfort.

"Photo-rejuvenation" is the term most often used to describe the desired result of improving these multiple skin anomalies using light-based therapy; and while promises of the proverbial "Fountain of Youth" are still a bit premature, current capabilities treating "aged skin" are not insignificant.

However, no one laser or light-based system can treat all the above-mentioned conditions, and individual response to specific laser treatments varies from individual to individual.

Still, as experience grows treating these varied skin disorders, it now appears some sort of combination approach—using multiple lasers to affect multiple therapeutic responses—may hold the best possibility of providing overall improvement in the appearance of one's skin.

This paper discusses the combined use of three different lasers of varying wavelengths to demonstrate "photo-rejuvenation" and scar improvement—the pulsed dye Vbeam® laser (595 nm), the GentleLASE® alexandrite laser (755 nm), and the GentleYAG™ laser (1064 nm).

## Method

Each patient was treated with all three lasers during the same session. The Vbeam was used first so the telangiectasias were not obscured by any redness induced by the other lasers. The GentleLASE was used next and the GentleYAG last. The reason I chose the GentleYAG last was because it is the least well tolerated and if done before the GentleLASE, the patients were less likely to complete all three lasers. Ela-Max® was applied 30 minutes prior to the treatment and washed off completely before beginning. The settings were as follows: Vbeam 10 mm spot, 7.5 J/cm², 20 msec pulse duration, DCD 30/20; GentleLASE 12 mm spot, 40 J/cm², DCD 60/50; and GentleYAG 12 mm spot, 30 J/cm², DCD 50/40.

For patients with Types IV and V skin, the GentleLASE was not used. The Vbeam and GentleYAG were used without side-effects in those individuals although hyperpigmentation can occur with the Vbeam in pigmented skin. Facial edema was occasionally seen for one to four days following treatment, which was minimized on subsequent sessions with elevation while sleeping and by applying ice packs the first day. No scarring or pigmentation abnormalities have been seen to date in my patients.




GentleYAG™

3:08-MC-8011-PJH
Exhibit A
1 of 2

CANTX043756

# CLINICAL BULLETIN

No. **6**

## Results

Case 1: A 41-year-old female with solar lentigines, enlarged pores, fine lines, and telangiectasias was treated with three sessions at monthly intervals, resulting in reduction in lentigines, minimization of fine lines around the eyes, and decreased pore size on the nose and chin. The patient rated the improvement as good.

Case 2: A 61-year-old female with photo-aging and prominent vascular ectasias was treated with one session, resulting in good reduction in vascular lesions. The patient also reported better overall skin texture, although no clinical wrinkle improvement was seen after one session. The patient was satisfied with the results and declined further sessions.

## Discussion

The benefit of a multiple laser treatment regime is easily explained. Quite simply, more than one condition is being treated, resulting in that overall "photo-rejuvenation" effect. Multiple chromophores are differentially targeted using varying wavelengths of energy. The "rejuvenation" experienced by patients is actually a combined result from improvements in pigmentation, vascular, wrinkle reduction, pore shrinkage, and even hair removal.

Even for specific indications—wrinkle reduction, for example—using multiple lasers appears advantageous. The mechanism of action for laser wrinkle reduction appears to be the creation of a thermal injury within the dermis, resulting in the generation of new connective tissue which literally "pushes" the wrinkle from the inside out. The exact depth and

extent of that thermal injury created are wavelength-dependent. Therefore, using more than one laser to initiate collagen remodeling at various depths within the skin seems to have some benefit.

What is less quantifiable but no less readily observable is the symbiotic benefits of using multiple lasers to effect these results. Clinically, it appears that overall photo-rejuvenation is heightened when multiple wavelengths are incorporated.

The use of the Candela Vbeam (595 nm), GentleLASE (755 nm), and GentleYAG (1064 nm) lasers seems to stretch across the absorption spectrum of enough chromophores to result in the improvement of a variety of conditions contributing to aged skin. The "photo-rejuvenation" experienced is impressive as we gain ground on the proverbial Fountain of Youth.

 



*Case 1—Pretreatment*          *Post-treatment*

 

 



*Case 2—Pretreatment*          *Post-treatment*

**Candela Corporation**
530 Boston Post Road
Wayland, MA 01778, USA
Phone. (508) 358-7637
Fax: (508) 358-5569
Toll Free: (800) 821-2013
www.candelalaser.com



GentleYAG is a trademark and Vbeam and GentleLASE are registered trademarks of Candela Corporation.
Ela-Max is a registered trademark of Ferndale Laboratories, Inc. Dynamic Cooling Device and DCD are trademarks.
To find out more about Candela and its products, contact your authorized Candela representative,
or call toll free worldwide (800) 821-2013. Dial US country code if calling internationally. www.gentlelase.com
Printed in the USA. 03/03  0920-23-0188 Rev. 02

**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
11250 EL CAMINO REAL, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: 858.847.6700
FACSIMILE: 858.792.6773

Debra D. Nye, Cal. Bar No. 226076
dnye@foley.com

Attorneys For Respondent,
VIC NARURKAR, M.D.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CANDELA CORPORATION, et al., | Case No. C08-80011 Misc PJH (EDL) |
| Plaintiffs, | **DECLARATION OF VIC NARURKAR, M.D. IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DR. VIC NARURKAR TO PRODUCE DOCUMENTS** |
| v. | |
| PALOMAR MEDICAL TECHNOLOGIES, INC., | Hearing:     March 11, 2008 |
| Defendant. | Time:          9:00 a.m. |
| | Place:        Courtroom E |
| | The Honorable Elizabeth Laporte |

02/19/2008   15:19   4159233277          DR KATHY FIELDS          PAGE   01/02

1    I, Vic Narurkar, M.D., declare:

2    1.    I make this Declaration in opposition to Plaintiffs' Motion To Compel Dr. Vic Narukar

3    To Produce Documents. The statements in this Declaration are true and correct. If called as a

4    witness, I could and would testify thereto under oath. I have personal knowledge of the facts and

5    circumstances set forth herein.

6    2.    In connection with my medical practice, which is located in San Francisco, California, I

7    have treated several thousand patients.

8    3.    I estimate that I have at least 3,000 patient records in my possession. Most of these

9    records contain multiple comments about treatments provided to my patients. Almost all of

10    these treatment notes are handwritten, and relevant notes may appear in several sections of each

11    chart. I estimate that, in order to respond to the subpoena issued by the plaintiffs in this matter, it

12    would take several months to review the medical records in my possession to determine what

13    treatments were used on individual patients.

14    4.    My patient records are maintained alphabetically. They are not arranged by the date

15    when treatment was provided or by the type of procedure performed on the patient.

16    5.    There is only one administrative employee working with me, and the services of this

17    employee are essential to the operation of my offices.

18    6.    If my administrative employee was required to take time away from her normal duties to

19    review patients' medical records, I expect that my practice would suffer financial harm that I am

20    not able to quantify at this point.

21    7.    I beileve that the disclosure of confidential patient records in my possession – which

22    include photographs in many instances, as well as medical histories and other sensitive personal

23    information – could be ruinous to my practice, because my patients value their privacy and I

24    expect that many of them would not use my services if they learn that their records will be

25    disclosed.

26    I declare under the penalty of perjury that the foregoing is true and correct.

27    DATE: FEBRUARY 19, 2008

_____
Vic Narurkar, M.D.

28

2

DECLARATION OF VIC NARURKAR, M.D.